780 F.2d 1515
 The STATE OF UTAH, By and Through its DIVISION OF STATE
LANDS, Plaintiff- Appellant,
v.
UNITED STATES of America; William P. Clark, Secretary of
the Department of the Interior; Robert F. Burford, Director
of the Bureau of Land Management within the Department of
the Interior; and Roland G. Robison, Jr., Utah State
Director of the Bureau of Land Management; Defendants-Appellees.
 No. 83-1731.
 United States Court of Appeals,
Tenth Circuit.
 Dec. 26, 1985.
 
 Dallin W. Jensen, Sol. Gen. of the State of Utah (David L. Wilkinson, Atty. Gen. of the State of Utah, Michael M. Quealy and R. Douglas Credille, Asst. Attys. Gen., Salt Lake City, Utah, were also on the brief), for plaintiff-appellant.
 Lois J. Schiffer, Atty., Dept. of Justice (F. Henry Habicht, II, Asst. Atty. Gen., Washington, D.C., Brent D. Ward, U.S. Atty., Salt Lake City, Utah, Dirk D. Snel, Steven A. Herman, and Lawrence W. Puckett, Attys., Dept. of Justice, Washington, D.C., were also on the brief), for defendants-appellees.
 Before HOLLOWAY, Chief Judge, and DOYLE and LOGAN, Circuit Judges.
 HOLLOWAY, Chief Judge.
 
 
 1
 The State of Utah timely appeals from a summary judgment quieting title in the United States to the bed of Utah Lake, located in Utah County, Utah. Judgment was entered on the theory that the United States withdrew the lakebed as part of an 1889 reservoir site selection, and that title did not pass to the State of Utah under the equal footing doctrine when Utah became a State in 1896, and that title to the lakebed did not pass to the State under the Submerged Lands Act of 1953, 43 U.S.C. Secs. 1301-1315. 624 F.Supp. 622 (D.Utah 1983).
 
 
 2
 We affirm.
 
 
 3
 * The factual background
 
 
 4
 As noted in Utah's brief, the controversy that gave rise to this litigation occurred in the autumn of 1976 when the Bureau of Land Management of the Department of the Interior began to issue oil and gas leases on the bed of Utah Lake[1]--an act that the State viewed as a violation of its ownership and property rights to the bed of Utah Lake. Appellant's Brief 2; see also I R. 39, 48. Following unsuccessful efforts to resolve the conflicting claims, the State initiated this action to quiet title.
 
 
 5
 In its complaint the State claimed that on January 4, 1896, by virtue of the State's admission into the Union on an equal footing with all other states, the State of Utah became the owner, and has ever since been the owner, of the bed of Utah Lake, a navigable body of water located wholly within the State. I R. 1-2. Utah Lake is the largest freshwater lake in the State, with a surface area of approximately 150 square miles. Marsh, 740 F.2d at 800.
 
 
 6
 By way of an amended complaint, the State alternatively claimed that if for any reason it did not obtain title to the bed of Utah Lake at the date of statehood, it obtained full title thereto, including all natural resources in the bed and waters of such lake, on or about May 22, 1953, by virtue of the Submerged Lands Act, 43 U.S.C. Secs. 1301 et seq., and particularly Sec. 1311(a). I R. 40. The State requested the court to adjudicate and declare the State of Utah to be the owner of the bed of Utah Lake and the natural resources associated therewith and also requested that the court enjoin defendants from interfering with Utah's ownership and management. I R. 2-3, 40.
 
 
 7
 By way of answer, defendants denied all of Utah's ownership claims to the bed of Utah Lake. I R. 10-11, 47-48. Defendants asserted that title to the bed of the lake had remained in federal ownership by virtue of a reservoir site selection on April 6, 1889, by then Director of the United States Geological Survey, J.W. Powell, and that the State received no title to the lands in question by virtue of the Submerged Lands Act. I R. 97-98. Defendants further claimed, as a procedural and jurisdictional matter, that any legal challenge regarding the effect of the 1889 withdrawal on the title to the bed of Utah Lake had to be brought under the Quiet Title Act, 28 U.S.C. Sec. 2409a, by the party disputing the title of the United States, and that any action brought under the Quiet Title Act by plaintiff was barred by the statute's 12-year limitation period in Sec. 2409a(f). I R. 97.
 
 
 8
 Cross-motions for summary judgment were filed. After a hearing, the district court issued its Memorandum Opinion and Order observing as an initial matter that the parties were in dispute regarding the procedure by which the case had come before the court, with plaintiff insisting that the suit was one for a declaratory judgment and defendants maintaining that it was a quiet title action; however, the court declined to resolve this jurisdictional dispute, ruling that either theory gave it the opportunity to examine the merits of the case.[2] II R. 332.
 
 
 9
 Turning to the merits, the district court found that the United States withdrew the bed of Utah Lake as part of the 1889 reservoir site selection, as revealed by language used in the correspondence and documents surrounding the 1889 withdrawal. The court further found that the withdrawal of Utah Lake was made after the United States acquired the territory, and before the State of Utah was created, for the appropriate public purpose of providing irrigation for future settlers of the arid west; thus, the United States' title in the area was not cut off by the subsequent creation of the State and the application of the equal-footing doctrine. Finally, the court rejected the State's contention that it obtained title to the bed of Utah Lake under the Submerged Lands Act, ruling that the bed of Utah Lake was excluded from the application of that Act by way of the exception provided in Sec. 1311(a) for land retained by the United States before statehood. The court denied plaintiff's motion and granted defendants' motion for summary judgment.
 
 
 10
 On appeal, the issues presented are (1) whether the pre-statehood reservoir site withdrawal by the United States on Utah Lake prevented the State of Utah from acquiring title to the bed of Utah Lake as a matter of constitutional equal-footing, and (2) whether the Submerged Lands Act confirms any interest in the bed of Utah Lake in the State of Utah. Appellant's Brief 1-2.[3]
 
 II
 The equal-footing doctrine
 
 11
 In Potter v. Murray City, 760 F.2d 1065 (10th Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 145, 88 L.Ed.2d 120 (1985), we stated:
 
 
 12
 The equal footing doctrine embraces the precept that each state is equal in power, dignity, and authority, and that a state's sovereign power may not be constitutionally diminished by any conditions in the acts under which the State was admitted to the Union; any conditions imposed by Congress would not operate to restrict the State's legislative power in respect of any matter which was not plainly within the regulating power of Congress. Coyle v. Smith, 221 U.S. 559, 567, 573, 574 [31 S.Ct. 688, 690, 692, 693, 55 L.Ed. 853] (1911).
 
 
 13
 Id. at 1067 (footnote omitted).
 
 
 14
 In Montana v. United States, 450 U.S. 544, 551-52, 101 S.Ct. 1245, 1251, 67 L.Ed.2d 493 (1981), the Supreme Court summarized the basic principles of the equal-footing doctrine in issue here as follows:
 
 
 15
 As a general principle, the Federal Government holds [lands under navigable waters] in trust for future States, to be granted to such States when they enter the Union and assume sovereignty on an "equal footing" with the established States. Pollard's Lessee v. Hagan, 3 How. 212, 222-223, 229 [11 L.Ed. 565]. After a State enters the Union, title to the land is governed by state law. The State's power over the beds of navigable waters remains subject to only one limitation: the paramount power of the United States to ensure that such waters remain free to interstate and foreign commerce. United States v. Oregon, 295 U.S. 1, 14 [55 S.Ct. 610, 615, 79 L.Ed. 1267]. It is now established, however, that Congress may sometimes convey lands below the high-water mark of a navigable water,
 
 
 16
 "[and so defeat the title of a new State,] in order to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several States, or to carry out other public purposes appropriate to the objects for which the United States hold the Territory." Shively v. Bowlby, 152 U.S. 1, 48 [14 S.Ct. 548, 566, 38 L.Ed. 331].
 
 
 17
 But because control over the property underlying navigable waters is so strongly identified with the sovereign power of government, United States v. Oregon, supra, [295 U.S.] at 14 [55 S.Ct. at 615] it will not be held that the United States has conveyed such land except because of "some international duty or public exigency." United States v. Holt State Bank, 270 U.S., at 55 [46 S.Ct. 197, 199, 70 L.Ed. 465]. See also Shively v. Bowlby, supra, [152 U.S.] at 48 [145 S.Ct. at 199]. A court deciding a question of title to the bed of a navigable water must, therefore, begin with a strong presumption against conveyance by the United States, United States v. Oregon, supra, [295 U.S.] at 14 [55 S.Ct. at 615], and must not infer such a conveyance "unless the intention was definitely declared or otherwise made plain," United States v. Holt State Bank, supra, [270 U.S.] at 55 [46 S.Ct. at 199], or was rendered "in clear and especial words," Martin v. Waddell, supra, [16 Pet. 367] at 411, [10 L.Ed. 997], or "unless the claim confirmed in terms embraces the land under the waters of the stream," Packer v. Bird, supra, [137 U.S. 661] at 672 [11 S.Ct. 210, 212, 34 L.Ed. 819].
 
 
 18
 Although the Court in Montana referred specifically to pre-statehood conveyances, the same principles also apply to pre-statehood reservations or withdrawals by the United States. See United States v. City of Anchorage, State of Alaska, 437 F.2d 1081, 1084-85 (9th Cir.1971); United States v. Alaska, 423 F.2d 764, 766-68 (9th Cir.), cert. denied, 400 U.S. 967, 91 S.Ct. 363, 27 L.Ed.2d 388 (1970).
 
 
 19
 Here there is no dispute that Utah Lake is a navigable body of water.[4] The question is whether the presumption under the equal-footing doctrine--that the beds of navigable waters remain in trust for future states and pass to the new states when they assume sovereignty--has been overcome by some " 'definitely declared' " or " 'plain' " intent to withdraw the bed of Utah Lake "because of 'some international duty or public exigency.' Montana, 450 U.S. at 552 [101 S.Ct. at 1251] (quoting United States v. Holt State Bank, 270 U.S. 49 [46 S.Ct. 197 (1926)." We now will examine the scope of the 1889 reservoir site selection, the statutory authorization for that selection, and the purposes for which the selection was made.
 
 
 20
 * The 1889 reservoir site selection
 
 
 21
 The selection of Utah Lake as a reservoir site was made in 1889 by John Wesley Powell, then Director of the United States Geological Survey (U.S.G.S.), under the provisions of the Act of Oct. 2, 1888, ch. 1069, 25 Stat. 505, 526-27 (hereinafter "1888" Act).[5] In a report to the Secretary of the Interior, dated April 6, 1889, Director Powell wrote:
 
 
 22
 I have the honor to report that the site of Utah Lake in Utah County in the Territory of Utah is hereby selected as a reservoir site, together with all lands situate within two statute miles of the border of said lake at high water.
 
 
 23
 Pending the more accurate designation of the boundaries of the foregoing site by township, section and quarter-section lines, I respectfully recommend that the Register of the Land Office at Salt Lake City be instructed to refuse further entries of public land within the foregoing prescribed limits.
 
 
 24
 I venture to add that speedy action should be taken in this matter as any further entries of the lands adjoining Utah Lake will have a tendency to defeat the purposes of the law and obstruct the use of the lake as a natural reservoir for the irrigation of lands below its outlet.
 
 
 25
 I R. 142-43 (reprinting letter from Director of the Geological Survey to the Secretary of the Interior) (emphasis added).
 
 
 26
 Utah asserts that the 1889 reservoir site selection did not include the bed of Utah Lake because Director Powell's report does not specifically or unambiguously refer to the bed of Utah Lake or its minerals. Appellant's Brief 24-25. However, when the report is read together with other agency documents surrounding the withdrawal, we feel that the intentions of the U.S.G.S. are made sufficiently clear. For example, when informing Congress of the reservoir site selection in its Tenth Annual Report, the U.S.G.S. included the following description of the hydrographic work in Utah:
 
 
 27
 In April Mr. Newell was sent to Utah to make certain examinations of Utah Lake with reference to its capacity for a reservoir site and to furnish the specifications for its withdrawal as such under the law, so far as the lands covered or overflowed by it or the lands bordering upon it were still public lands.
 
 
 28
 I R. 151 (reprinting Tenth Annual Report of the United States Geological Survey to the Secretary of the Interior 1888-89, Part 2, at 88). (emphasis added).
 
 
 29
 Even more telling is the agency's express reference to the bed of Utah Lake in its Eleventh Annual Report:
 
 
 30
 In Utah, in addition to the general reconnaissance of the storage facilities at the headwaters of the Sevier River and other streams, a careful survey was made of Utah Lake. This survey, run by level and transit around the lake, was for the purpose of determining the area which would be covered by damming or holding back the flood water. A description of the location and physical features of this body of water is to be found in this report under the head of Hydrography, and it will suffice to state here that after a careful study it was found that, on account of the excessive evaporation from such an enormous surface, the lake was too large to act in an economical manner as a storage reservoir. On the other hand, while it may not be advisable to hold back the water to a point above that of the average height, yet there is sufficient evidence to show that natural forces at times may raise the water level and increase the area to abnormal proportions by backing water over the great fringing marshes on the east and south. This land being, therefore, the natural flood ground of the lake should be reserved up to the high-water line. Accordingly, the segregation, as shown on Pl. xcv and given in the following lists, was made to include not only the bed but the lowlands up to mean high water.
 
 
 31
 I R. 153-54 (reprinting Eleventh Annual Report of the United States Geological Survey to the Secretary of the Interior 1889-90, Part II Irrigation 183-84) (emphasis added).
 
 
 32
 Finally, the agency stated in its Twelfth Annual Report:
 
 
 33
 [T]he lake is in effect too large to be most effective as a storage reservoir.... [T]he efficiency of the lake as a reservoir would be greatly increased if its area could be reduced even to less than half of its present extent....
 
 
 34
 Thus, while to obtain the maximum amount of water in years of scarcity it would be better if the lake were small, yet to take care of the floods, which will happen at intervals of from five to ten years, it is necessary that the lake have a flood area as large as it now has, or even what it would have at the highest water. From consideration of these points the segregation of the land around and under the lake was made to a contour line which should be 5 feet above the low-water mark of 1879.
 
 
 35
 Twelfth Annual Report of the United States Geological Survey to the Secretary of the Interior 1890-91, Part 2, at 339 (emphasis added) (citation omitted).
 
 
 36
 The language of these documents reveals that the United States intended to and did in fact select the entire lakebed as part of the 1889 reservoir site selection. These documents comprise the involved agency's contemporaneous interpretation and understanding of the scope of the selection which were not unreasonable and as such are entitled to deference. See Choctaw Nation v. Oklahoma, 397 U.S. 620, 631, 90 S.Ct. 1328, 1334, 25 L.Ed.2d 615 (1970); Udall v. Tallman, 380 U.S. 1, 16-18, 85 S.Ct. 792, 801-02, 13 L.Ed.2d 616 (1965).
 
 B
 Congressional authorization
 1. The Act
 
 37
 Utah argues that even if the 1889 reservoir site selection included the bed of Utah Lake, that selection was not valid because Congress did not authorize withdrawal of the lakebed under the 1888 Act. Appellant's Brief 25; Appellant's Reply Brief 6. Specifically, Utah argues that the 1888 Act merely provided that, once selected, reservoir sites located in the public domain were withdrawn from sale and were not thereafter open to entry, settlement, or occupation until further provided by law. The State asserts that beds of navigable waters were not legally or physically subject to any type of private entry or sale as property of the United States, and therefore were not covered by the Act's withdrawal provisions. Appellant's Brief 22-23; Appellant's Reply Brief 6.
 
 The 1888 Act provides:
 
 38
 [A]ll the lands which may hereafter be designated or selected by such United States surveys for sites for reservoirs, ditches or canals for irrigation purposes and all the lands made susceptible of irrigation by such reservoirs, ditches or canals are from this time henceforth hereby reserved from sale as the property of the United States and shall not be subject after the passage of this act, to entry, settlement or occupation until further provided by law....
 
 
 39
 25 Stat. 527.
 
 
 40
 The State would have us read the Act's proscription on "entry, settlement or occupation" of lands selected under the Act as excluding the beds of navigable waters. However, by its terms the statute provides broadly that "all the lands which may hereafter be designated or selected ... for sites for reservoirs ... for irrigation purposes" were to be thenceforth "reserved from sale as the property of the United States," as well as not being "subject ... to entry, settlement or occupation." Id. The statute thus imposes no restriction on the U.S.G.S.'s selection authority on the type of lands that could be designated or selected. We find no merit in the contention that the terms of the Act excluded the beds of navigable waters from lands that could be selected under the Act.
 
 2. Subsequent Congressional Action
 
 41
 Utah points out that after the 1888 Act was passed, the U.S.G.S. proceeded to withdraw vast tracts of land as potentially irrigable or for reservoir sites, causing a furious outcry in the West, including charges that the U.S.G.S. was attempting to prevent further settlement. Utah states that discontent with existing large reservoir site withdrawals led to the enactment of various amendments to the 1888 Act which, it says, had the effect of restricting the 1889 withdrawal on Utah Lake. Utah asserts that the trial court in its opinion failed to address or take into account the effect of these amendments on the original 1889 withdrawal of Utah Lake. Appellant's Brief 24.
 
 
 42
 Congress amended the 1888 Act several times--in 1890, in 1891, and in 1897.[6] However, on none of these occasions did Congress modify or rescind the withdrawal of Utah Lake including its bed. In the Act of Aug. 30, 1890, ch. 897, 26 Stat. 371, 391, Congress repealed the 1888 provision "except that reservoir sites heretofore located or selected shall remain segregated and reserved from entry or settlement as provided by said [A]ct, until otherwise provided by law, and reservoir sites hereafter located or selected on public lands shall in like manner be reserved from the date of the location or selection thereof." [Emphasis added]. In the Act of Mar. 3, 1891, ch. 561, 26 Stat. 1095, 1101-02, Congress restricted the location and selection of reservoir sites to "only so much land as is actually necessary for the construction and maintenance of reservoirs," and also provided for rights-of-way through public lands and reservations of the United States to canal or ditch companies formed for the purpose of irrigation provided "[t]hat no such right of way shall be located as to interfere with the proper occupation by the Government of any such reservation...." [Emphasis added]. Finally, in the Act of Feb. 26, 1897, ch. 335 29 Stat. 599, Congress provided that:
 
 
 43
 [A]ll reservoir sites reserved or to be reserved shall be open to use and occupation under the right-of-way Act of March Third, eighteen hundred and ninety-one. And any State is hereby authorized to improve and occupy such reservoir sites to the same extent as an individual or private corporation, under such rules and regulations as the Secretary of the Interior may prescribe: Provided, That the charges for water coming in whole or part from reservoir sites used or occupied under the provisions of this Act shall always be subject to the control and regulation of the respective States and Territories in which such reservoirs are in whole or part situate. [Emphasis in original]
 
 
 44
 See generally California v. United States, 438 U.S. 645, 659-63, 98 S.Ct. 2985, 2993-95, 57 L.Ed.2d 1018 (discussing 1888 Act and amendments as background to Reclamation Act of 1902).
 
 
 45
 We are not persuaded that any of the legislation relied on by the State modified or overrode the effect of the Utah Lake reservoir site selection.
 
 3. Legislative History of the Amendments
 
 46
 Utah's brief reviews in considerable detail selected portions of the legislative history of the amendments and asserts that this history is relevant to ascertain not only the intent of Congress regarding those amendments, but also that concerning the 1888 Act itself, citing Andrus v. Shell Oil Co., 446 U.S. 657, 668-671, 100 S.Ct. 1932, 1939-41, 64 L.Ed.2d 593 (1980), and Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 380-81, 89 S.Ct. 1794, 1801-02, 23 L.Ed.2d 371 (1969), inter alia.
 
 
 47
 Relying on statements made during the floor debates of the 1890 amendment, Utah argues that the 1888 Act was passed for a very limited purpose--to control the rampant speculation and monopoly then going on in the West--and that Congress intended only temporarily to withdraw such lands until it could act to ensure that those making entry under public land laws for reservoir sites and irrigation purposes would occupy and develop the land in a fair and orderly fashion; and by their nature, beds of navigable waters simply could not have been a part of the problem Congress wanted to remedy. Appellant's Brief 26-30 (quoting statements of Sen. Reagan and Rep. Cogswell, 21 Cong.Rec. 7359, 7399, 7771 (1890)); Appellant's Reply Brief 7.
 
 
 48
 Utah also maintains that in authorizing the withdrawal of reservoir sites, Congress intended that such reservoir sites located around natural navigable lakes withdraw only the adjacent uplands that might be inundated, not the bed of the natural water course. It says that the primary concern here was that if settlers entered and claimed lands in close proximity to a natural lake, they would have to be compensated if the reservoir later inundated their land. Therefore, Utah argues, it would be illogical to assume that Congress could have intended to withdraw the beds of lakes which were already covered by water. Appellant's Brief 32-34 (quoting statements of Sen. Jones, 21 Cong.Rec. 7386, 8327 (1890)).
 
 
 49
 We are not persuaded by either of these arguments. First, the plain language of the statute refutes the State's claim that the legislative history of the amendments demonstrates that reservoir site withdrawals were only "temporary," not permanent. In the 1888 Act, the reservoir sites were reserved by the United States "until further provided by law," 25 Stat. 527 and thus the statute itself provided for the possibility of non-temporary withdrawals.
 
 
 50
 Second, the State's argument that Congress intended only that the adjacent uplands surrounding natural navigable lakes be withdrawn as reservoirs, assumes that Congress was concerned in every instance with those uplands that might be inundated if and when the water level was raised. We feel that assumption is unwarranted. The 1888 Act places no such limitation on the U.S.G.S.'s withdrawal authority, and, as noted earlier, the agency's contemporaneous understanding of the statute was that it authorized the selection of Utah Lake, including its bed. Moreover, although officials of the U.S.G.S. initially thought that the water level of Utah Lake should be raised, subsequent studies indicated that the water level should be lowered below the natural shoreline. In testimony before the Select Committee on Irrigation and Reclamation of Arid Lands, F.H. Newell of the U.S.G.S. stated:
 
 
 51
 I came here in March, and began first a survey of Utah Lake. I made a careful survey of the shore lines and the amount of land that would be overflowed by raising the lake according to the wishes of the people.
 
 
 52
 ....
 
 
 53
 ... At first it was thought necessary to raise the lake in order to get more water, but on more careful study I think the lake can perform its full functions best by drawing down below the natural shore lines, rather than by raising it above them. In other words, if raised above, the lake will be too large for the evaporation area. The evaporation is even now too great in proportion to the amount of water than can be taken out. My estimates show that the evaporation this spring has been twice as much as the water coming from the Jordan [River]. If this lake is raised that proportion must increase; while if it is lowered, and the outlets consequently are lowered, the proportion lost by evaporation will be less compared with that which can be utilized.
 
 
 54
 5 Reports of Committees of the Senate of the United States for the First Session of the Fifty-First Congress 1889-90, pt. 3, at 55, 61 (1890); see also Twelfth Annual Report, supra, at 339 ("[T]he efficiency of the lake as a reservoir would be greatly increased if its area could be reduced even to less than half of its present extent....").
 
 
 55
 Beyond this, a basic difficulty with Utah's line of argument is that it is based almost entirely on the views of individual Congressmen who were part of a different Congress from that which passed the 1888 Act. The Supreme Court has admonished that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." United States v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960). Here the language of the 1888 Act, and the contemporaneous understanding of the Act by the agency involved in its administration support the validity of the U.S.G.S.'s authority to include the bed of Utah Lake in its 1889 selection.
 
 4. The Mineral Estate
 
 56
 Utah asserts that in any event the 1888 Act authorized withdrawal of the surface estate only, and not the mineral estate, and that if the mineral estate had not been reserved or withdrawn, it would have passed to Utah at statehood. We find no merit in this argument. The 1888 Act does not distinguish between surface and subsurface estates in authorizing withdrawals of reservoir sites, nor is any such distinction made in the selection order and the documents surrounding the selection. We hold, therefore, that the 1888 Act and the reservation made pursuant to it covered the lakebed, and underlying minerals, not just the surface of the bed, among the lands withdrawn in connection with Utah Lake.
 
 C.
 The selection purposes
 
 57
 Apart from questions of congressional intent, Utah argues that it must not be deprived of title to the bed of Utah Lake except upon a strict and narrow concept of "public exigency," citing Montana, 450 U.S. at 552, 556, 101 S.Ct. at 1251, 1253. Utah says that a public exigency requires a public necessity and not simply an "appropriate public purpose" as the district court apparently thought. Its brief argues that under no reasonable view of the facts and legislative history can it be said that Congress imagined some public exigency would go unresolved if the bed of Utah lake were not withdrawn. Appellant's Reply Brief 13-14. In Montana, the Court did stress the general principle of holding land in trust for future States and that control over property underlying navigable waters is strongly identified with the sovereign power of government. Montana, 450 U.S. at 551-52, 101 S.Ct. at 1251-52. However, the Court also stated:
 
 
 58
 It is now established, however, that Congress may sometimes convey lands below the high-water mark of a navigable water,
 
 
 59
 "[and so defeat the title of a new State,] in order to perform international obligations, or to effect the improvement of such lands for the promotion and convenience of commerce with foreign nations and among the several States, or to carry out other public purposes appropriate to the objects for which the United States hold the Territory." Shively v. Bowlby, 152 U.S. 1, 48 [14 S.Ct. 548, 566].
 
 
 60
 Id. at 551, 101 S.Ct. at 1251 (emphasis added) (brackets in opinion of Supreme Court). The Court went on to emphasize that "because control over the property underlying navigable waters is so strongly identified with the sovereign power of government, ... it will not be held that the United States has conveyed such land except because of 'some international duty or public exigency.' " Id. at 552, 101 S.Ct. at 1251 (quoting United States v. Holt State Bank, 270 U.S. 49, 55, 46 S.Ct. 197, 199, 70 L.Ed. 465 (1926)) (emphasis added).[7]
 
 
 61
 In the instant case, the district court held that "[t]he withdrawal of Utah Lake was made 'after acquiring the territory and before the creation of the state' for the carrying out of 'public purposes appropriate to the objects for which the territory was held.' Those purposes include irrigation for the benefit of future settlers of the arid West." II R. 336 (quoting Holt State Bank, 270 U.S. at 54-55, 46 S.Ct. at 198-99). Although the court did not characterize its holding explicitly in terms of a "public exigency," we are satisfied that the withdrawal of Utah lake, including its bed, was made for a public purpose motivated by a public exigency, given Congress' stated concerns that arid lands of the western states be orderly and fairly irrigated, reclaimed, and settled. See 25 Stat. 526-27. That the United States may now be using the site for the additional purpose of developing minerals under the lake does not defeat the validity of the reservation of the lakebed based on the public exigency existing at the time the site selection was made.
 
 
 62
 In sum, we conclude that the title to the bed of Utah Lake did not pass to the State of Utah upon its admission to the Union under the equal-footing doctrine.
 
 III
 The Submerged Lands Act
 
 63
 The State further argues that the 1889 withdrawal, even if valid initially, no longer has any force or effect because it was superseded in 1953 by the Submerged Lands Act, 43 U.S.C. Secs. 1301-1315, which, it says, disclaimed to the states any federal interest in any beds of inland navigable waters, unless the United States was actually in possession of such lands under some claim of right. Appellant's Brief 69. Utah asserts that it obtained title to the bed of Utah Lake under the Act because the United States was not in actual possession of the lakebed in 1953 or, for that matter, at any time since Utah's statehood. Id.
 
 
 64
 We must disagree. Sections 1311(a) and (b)(1) of the Submerged Lands Act provide:
 
 
 65
 (a) It is determined and declared to be in the public interest that (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters ... be, and they are, subject to the provisions hereof, recognized, confirmed, established, and vested in and assigned to the respective States ...;
 
 
 66
 (b)(1) The United States releases and relinquishes unto said States and persons aforesaid, except as otherwise reserved herein, all right, title, and interest of the United States, if any it has, in and to all said lands, improvements, and natural resources....
 
 
 67
 43 U.S.C. Secs. 1311(a), (b)(1) (emphasis added). Section 1313(a), in turn, excepts from the operation of Sec. 1311, inter alia, "all lands expressly retained by ... the United States when the State entered the Union (otherwise than by a general retention ... of lands underlying the marginal sea)."
 
 
 68
 As discussed in Part II, supra, the United States expressly reserved the bed of Utah Lake for federal reservoir purposes in 1889, seven years before Utah became a state. Thus, this case falls squarely within the language of Sec. 1313(a), and the 1889 withdrawal remains valid. See United States v. Alaska, 423 F.2d at 768.
 
 
 69
 Utah argues, however, that the legislative history of the Submerged Lands Act shows that Congress intended to include Utah Lake as part of the inland navigable waters vested and confirmed in state ownership by the Act. Utah relies on Appendix F of the Senate Report, which shows the total acres of inland waters in the State of Utah. Utah then refers to the source of that appendix, a Census Bureau report, to determine the number of acres of inland navigable waters in Utah County. Finally, it uses a series of tables and maps in the Census publication to conclude that Utah Lake must have been included among the waters totalled for the State. Appellant's Brief 70-73.
 
 
 70
 Utah's reliance on the legislative history of the Act is misplaced. Appendix F of the Senate Report, entitled "Approximate areas of submerged lands within State boundaries," see III R. 93, simply describes the inland waters that are subject to the Submerged Lands Act and does not reflect any reduction to account for the exceptions contained in Sec. 1313. Furthermore, the Census report on which that appendix was based, Areas of the United States, 1940, 16th Census of the United States, was, as its title indicates, taken from a 1940 census and was not tailored to the exceptions provided in the Submerged Lands Act of 1953.
 
 
 71
 Utah also argues that it never expressly agreed to federal ownership of the bed of Utah Lake at the time of statehood, and that such agreement is essential to trigger the exception in Sec. 1313, citing statements in the legislative hearings. This argument, however, would have us ignore the explicit language in the statutory exception, which speaks only of lands "expressly retained by ... the United States when the States entered the Union," 43 U.S.C. Sec. 1313(a), and says nothing of state concurrence. Thus, the absence of agreement is irrelevant to the question whether title to the bed of Utah Lake vested in the State under the Submerged Lands Act.
 
 
 72
 We conclude that the title of the United States to the bed of Utah Lake was not altered by the passage of the Submerged Lands Act. The United States expressly withdrew the lakebed prior to statehood and under Sec. 1313(a) Congress specifically excepted such lands from the operation of the Act.
 
 IV
 Conclusion
 
 73
 Accordingly, the district court's summary judgment quieting title to the bed of Utah Lake in the United States is
 
 
 74
 AFFIRMED.
 
 
 
 [1]
 For a general description of Utah Lake, see Utah v. Marsh, 740 F.2d 799, 800-01 (10th Cir.1984)
 
 
 [2]
 The United States notes in its brief, Brief for the Appellees 9 n. 4, that after the district court issued its Memorandum Opinion and Order in this case, the Supreme Court handed down an important decision on the Quiet Title Act, 28 U.S.C. Sec. 2409a, in Block v. North Dakota ex rel. Board of University and School Lands, 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983). In Block the Court ruled that Congress intended the Quiet Title Act to provide the exclusive means by which adverse claimants could challenge the United States' title to real property, and that the States must fully adhere to the twelve-year limitation period in Sec. 2409a(f) when suing the United States. Id. at 282-90, 103 S.Ct. at 1817-22
 We agree that under Block, the present action must be characterized as one for quiet title, and not as one for declaratory judgment, as the trial court apparently thought. The statute of limitations provided by 28 U.S.C. Sec. 2409a is not an issue on this appeal. The Government states in note 4 in its brief before us that the district court rested its finding of Quiet Title Act jurisdiction in part on the factual determination that the 12-year statute had not run; and because the court of appeals would only reverse such a finding if it were clearly erroneous, the Government has not challenged the ruling that the district court had Quiet Title Act jurisdiction to decide the case.
 
 
 [3]
 The United States points out that a large part of Utah's brief discusses opinions and actions by State and Federal officials who may have thought or assumed that Utah owned the bed of Utah Lake, and states that if the State is implicitly arguing an estoppel theory, that theory should be rejected. Brief for the Appellees 37-40. However, the propositions as stated in the briefs filed for the State do not actually urge an estoppel theory and at argument counsel for the State said the State is not arguing an estoppel. Accordingly, we do not reach that issue
 
 
 [4]
 The pretrial order reflects that the following statement of facts was agreed on by the parties (I R. 98):
 B. On January 4, 1896, (the date of Utah's statehood) Utah Lake was "navigable-in-fact" under federal law and was susceptible of being used, in its ordinary condition, as a highway of commerce over which trade and travel may have been conducted in the customary modes of trade and travel on water, all within the meaning of The Daniel Ball, 10 Wall. 557, 563 [19 L.Ed. 999] (1870), as interpreted and applied in United States v. Holt State Bank, 270 U.S. 49 [46 S.Ct. 197, 70 L.Ed. 465] (1926); United States v. Utah, 283 U.S. 64 [51 S.Ct. 438, 75 L.Ed. 844] (1931); and Utah v. United States, 406 U.S. 484 [92 S.Ct. 1691, 32 L.Ed.2d 246] (1972).
 
 
 [5]
 The 1888 Act provided in part as follows:
 FOR GENERAL EXPENSES OF THE GEOLOGICAL SURVEY: ...
 For the purpose of investigating the extent to which the arid region of the United States can be redeemed by irrigation, and the segregation of the irrigable lands in such arid region, and for the selection of sites for reservoirs and other hydraulic works necessary for the storage and utilization of water for irrigation and the prevention of floods and overflows, and to make the necessary maps, including the pay of employees in field and in office, the cost of all instruments, apparatus, and materials, and all other necessary expenses connected therewith, the work to be performed by the Geological Survey, under the direction of the Secretary of the Interior, the sum of one hundred thousand dollars or so much thereof as may be necessary. And the Director of the Geological Survey under the supervision of the Secretary of the Interior shall make a report to Congress on the first Monday in December of each year, showing in detail how the said money has been expended, the amount used for actual survey and engineer work in the field in locating sites for reservoires [sic] and an itemized account of the expenditures under this appropriation. And all the lands which may hereafter be designated or selected by such United States for sites for reservoirs, ditches or canals for irrigation purposes and all the lands made susceptible of irrigation by such reservoirs, ditches or canals are from this time henceforth hereby reserved from sale as the property of the United States, and shall not be subject after the passage of this act, to entry, settlement or occupation until further provided by law.
 
 
 [25]
 Stat. 505, 526-27
 
 
 [6]
 More recently, the 1888 Act was amended by Sec. 704(a) of the Federal Land Policy and Management Act of 1976, Pub. L. 94-579, 90 Stat. 2792. 43 U.S.C. Sec. 662 now provides that:
 Sites for reservoirs and other hydraulic works necessary for the storage and utilization of water for irrigation and the prevention of floods and overflows, located or selected prior to August 30, 1890, shall remain segregated and reserved from entry, or settlement, until otherwise provided by law, and reservoir sites thereafter located or selected on public lands shall in like manner be reserved from the date of the location or selection thereof.
 Thus, the recent amendment does not affect the validity of the Utah Lake reservoir site selection, and no argument to that effect is made by the State of Utah.
 
 
 [7]
 Later in the opinion, in discussing whether title to the bed of the Big Horn River passed to the State of Montana upon its admission to the Union, the Court elaborated upon the public exigency test as follows:
 [E]ven though the establishment of an Indian reservation can be an "appropriate public purpose" within the meaning of Shively v. Bowlby, 152 U.S., at 48 [14 S.Ct. at 566] justifying a congressional conveyance of a riverbed, see, e.g., Alaska Pacific Fisheries v. United States, 248 U.S. 78, 85 [39 S.Ct. 40, 63 L.Ed. 138] the situation of the Crow Indians at the time of the treaties [of 1851 and 1868] presented no "public exigency" which would have required Congress to depart from its policy of reserving ownership of beds under navigable waters for the future States. See Shively v. Bowlby, supra, [152 U.S.] at 48 [14 S.Ct. at 566]. As the record in this case shows, at the time of the treaty the Crows were a nomadic tribe dependent chiefly on buffalo, and fishing was not important to their diet or way of life.
 Montana, 450 U.S. at 556, 101 S.Ct. at 1253.