**UNITED STATES of America,**
**Appellant,**

v.

**STATE OF ALASKA et al., Appellees.**

**No. 24001.**

United States Court of Appeals,
Ninth Circuit.

March 20, 1970.

Rehearing Denied April 29, 1970.

Edmund B. Clark (argued), Atty., Dept. of Justice, Shiro Kashiwa, Asst. Atty. Gen., Dept. of Justice, Washington, D. C.; Douglas B. Baily, U. S. Atty., Anchorage, Alaska, Frank B. Friedman, Philadelphia, Pa., for appellant.

Robert L. Hartig, Asst. Atty. Gen. (argued), J. Rhodes (argued), Anchorage, Alaska, Joseph Rudd (argued), of Ely, Guess, Rudd & Havelock, Anchorage, Alaska, for appellees.

Before ELY, KILKENNY and TRASK, Circuit Judges.

KILKENNY, Circuit Judge:

This appeal grows out of an action by the United States to quiet title to the lands under Tustumena Lake, located in the southern half of the Kenai Moose Range in Alaska, in which action the state of Alaska and certain of its oil and gas lessees are parties defendant. All parties filed motions for summary judgment. All agree that the relevant facts are not in dispute. The trial court entered a summary judgment in favor of appellees on the ground that the land under the lake passed to the state of Alaska on its admission to the Union.

▌ The events leading up to this litigation may be briefly summarized as follows: The Territory of Alaska was ceded by Russia to the United States in the Treaty of March 13, 1867. On December 6, 1941, President Franklin D. Roosevelt, by Executive Order No. 8979, 6 Fed.Reg. 6471, established the Kenai National Moose Range as a Wildlife Refuge Area. The Order, withdrawing an area of approximately 2,000,000 acres, was promulgated for the purpose of protecting the natural breeding and feeding range of the giant Kenai moose on the Kenai Peninsula, Alaska.[1] The Order withdrew all of the areas of land and water of the United States lying on the northwest portion of the peninsula. In 1956, and again in 1957, oil was discovered in the northern half of the peninsula and on August 2, 1958, the Secretary of the Interior issued an Order closing

1. \*.  \*  \*  \*  \*
"ESTABLISHING THE KENAI
NATIONAL MOOSE RANGE
ALASKA
By virtue of the authority vested in me as President of the United States, it is ordered that, *for the purpose of protecting the natural breeding and feeding range of the giant Kenai moose on the Kenai Peninsula, Alaska,* which in this area presents a unique wildlife feature and an unusual opportunity for the study in its natural environment of the practical management of a big game species that has considerable local economic value, all of

the *hereinafter-described areas of land and water of the United States* lying on the northwest portion of the said Kenai Peninsula, *be, and they are hereby, subject to valid existing rights, withdrawn and reserved for the use of the Department of the Interior and the Alaska Game Commission as a refuge and breeding ground for moose* for carrying out the purposes of the Alaska Game Law of January 13, 1925, 43 Stat. 739, U.S.C., title 48, secs. 192–211, as amended:"
 \*   \*   \*   \*   \*

(Emphasis supplied.)

the southern half of the Kenai Moose Range to leasing because the leasing of such lands would be incompatible with management thereof for wildlife purposes.[2] Each order was made and entered while Alaska remained a territory of the United States. The submerged lands, the title to which is here in dispute, lie beneath Tustumena Lake, which is located within the area closed to leasing by the Order of August 2, 1958. Alaska did not become a state until January 3, 1959. In 1966, it issued oil and gas leases to segments of the lands beneath the waters of the lake. The lower court was evidently relying on cases construing the general land laws, such as Mann v. Tacoma Land Co., 153 U.S. 273, 14 S.Ct. 820, 38 L.Ed. 714 (1894), in holding that "public lands" did not include the land under the water.

The Act creating a civil government in Alaska, enacted May 17, 1884, 23 Stat. 24, 26, provided, among other things, that the general land laws of the United States should not be applicable to the Territory of Alaska. In construing the pertinent Alaskan statutes, the courts have consistently held that the words "public domain", "public lands" and "land", include land under water. Moore v. United States, 157 F.2d 760 (9th Cir. 1946), cert. denied 330 U.S. 827, 67 S.Ct. 867, 91 L.Ed. 1277; Alaska Pacific Fisheries v. United States, 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918); Hynes v. Grimes Packing Co., 337 U.S. 86, 69 S.Ct. 968, 93 L.Ed. 1231 (1949). To be recognized, of course, is the fact that many of the general land laws of the United States have been applied to Alaska, but this fact does not mean that those laws have general application or should be here controlling.

■ Beyond question, the appellant had power, prior to Alaskan statehood, to withhold, withdraw or convey the land and water for any valid purpose. In such case, the property withdrawn would not pass to the state. Moore v. United States, *supra*; United States v. Oregon, 295 U.S. 1, 55 S.Ct. 610, 79 L. Ed. 1267 (1935); Alabama v. Texas, 347 U.S. 272, 74 S.Ct. 481, 98 L.Ed. 689 (1954). The court below reasoned that the "lands of the United States", mentioned in the Executive Order, included only those lands that were subject to sale or other disposition under the General Land Laws. He likewise reasoned that the lands under navigable waters, such as the waters of the lake in question, were held in trust by the United States for future states and could not constitutionally be withdrawn or withheld by the Congress or by Executive Order of the President acting under a Congressional grant of power, save in exceptional circumstances when impelled to particular disposals by some international duty or public exigency. The court found, in this instance, there was no intent on the part of the United States to withdraw and reserve the submerged land in question. We disagree.

■ When we cast aside the many illusory contentions introduced and argued by both appellant and appellees, we have for decision a rather homespun issue. Simply stated, the problem before us is whether the questioned Executive Order was intended to include the land under the water of Lake Tustumena. We believe such intention is quite clearly expressed in the language of the Order. We commence with the fundamental premise that one of the most important factors in resolving the meaning of the pertinent language is to place ourselves, insofar as possible, in the posture of the President and surround ourselves with the factual atmosphere in which the

2. * * * * *

"Notice is hereby given that, pursuant to the regulation 43 CFR, 192.9 (Circular 1990), agreement, as reflected by the map herein referred to, has been consummated between the Bureau of Land Management and the United States Fish and Wildlife Service of this Department, designating those lands within the Kenai National Moose Range on the Kenai Peninsula, Alaska, which are hereby closed to oil and gas leasing because such activities would be incompatible with management thereof for wildlife purposes. * * *."

* * * * *

(Emphasis supplied.) 23 Fed.Reg. 5883.

Kenai Moose Range was created. The Order specifically withdraws and reserves for the use of the Department of the Interior and the then Alaska Game Commission,[3] as a game refuge, approximately 2,000,000 acres, described by metes and bounds, for the express purpose "of protecting the natural breeding and feeding range of the giant Kenai moose on the Kenai Peninsula, Alaska." The Order then goes on to declare that the area withdrawn "presents a unique wildlife feature and an unusual opportunity for the study in its natural environment of the practical management of a big game species that has considerable local economic value." Withdrawn by the Order was "all of the hereinafter described area of *land and water* of the United States."

The argument that the Order, in withdrawing the "water", did not withdraw the "navigable water", is patently unsound. If all navigable waters, lakes and streams are beyond the effect of the order, only mountains, hills, ridges, valleys and barren areas would remain for the moose to feed and breed. Appellees would have the male and female of this semi-aquatic animal find each other and mate in dense woods and thickets, and on precipitous mountains and cliffs, rather than in or around the tranquil waters of their natural habitat. President Roosevelt never intended such a result, nor did he envision the bulls and cows of this noble group standing on the shores of streams and lakes and there extending their necks to giraffelike proportions in order to enjoy the aquatic vegetation so essential to their continued existence. Water, in other words, is just as essential to the continued existence of the moose as it is to any other semi-aquatic animal in Alaska. If the Order failed to withdraw the navigable water in the designated area, it amounted to nothing more than an impotent gesture. If it failed to withdraw the land under the water, it would be just as sterile. In neither case would this magnificent animal be the beneficiary of the declared design of the Order.

Appellees argue that United States v. Holt State Bank, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 (1926), supports the trial court's conclusion that the submerged land here in question passed to Alaska on its admission to the Union. *Holt State Bank* employs the principle that where the United States, after acquiring the territory and before the creation of the state, has granted rights in lands, in carrying out public purposes appropriate to the objects for which the Territory was held, such rights are not impaired by the subsequent creation of a state, and the rights which otherwise would pass to the state by virtue of its admission to the Union, are restricted and qualified accordingly. As an appendix to this general principle, *Holt State Bank* points to Shively v. Bowlby, 152 U.S. 1, 47–48, 57–58, 14 S.Ct. 548, 38 L. Ed. 331 (1894), for use of the precept that land under navigable waters in acquired territory is generally held for the ultimate benefit of future states and that disposals by the United States during the territorial period are not lightly to be inferred and should not be regarded as intended unless the intention was definitely declared *or otherwise made very plain.* We have no difficulty in placing the language of the withdrawal Order within the meaning of "or otherwise made very plain". Although the precise question was not involved, the United States Supreme Court in Udall v. Tallman, 380 U.S. 1, 4–5, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), clearly recognizes that the land in the Kenai Moose Range was specifically reserved to the United States at the time of passage of the Alaska Statehood Act.

The factual background in Cherokee Nation or Tribe of Indians v. State of Oklahoma, 402 F.2d 739 (10th Cir. 1968), cert. granted 394 U.S. 972, 89 S. Ct. 1455, 22 L.Ed.2d 752, relied on by appellees, in no way parallels the one before us. The issue before that court

---

3. A territorial commission.

was whether the provisions of certain Indian Treaties were sufficiently clear to indicate an intent to reserve, in favor of the Indian Nation, the land under the navigable waters of the Arkansas River. The court held that there was nothing in the pertinent treaties, statutes and conveyances which indicated an intent of the United States, as trustee for the states to be formed, to convey away or reserve property held for the benefit of the new states. Here, we have arrived at the opposite conclusion in relation to the language of the Order before us.

■ Appellees would have us utilize and here apply the provisions of the Submerged Lands Act, 67 Stat. 29, 43 U.S.C. § 1301 *et seq.*, made applicable to Alaska by the Statehood Act. Specifically excluded from the operation of the Act are " * * * all lands expressly retained by or ceded to the United States when the State entered the Union * * * and any rights the United States has in lands presently and actually occupied by the United States under claim of right." 43 U.S.C. § 1313. The provisions of § 6(e) of the Statehood Act, 72 Stat. 339, 341, specifically exclude all land and water previously withdrawn. Consequently, the Submerged Lands Act has no application.

■■ Admittedly, Alaska was admitted to the Union on an equal footing with other states. However, this does not mean that the President had no power to previously promulgate the Executive Order here under scrutiny. If, as we now hold, the language of the Order is sufficiently clear to withdraw the water of the lake and the submerged land, the state's rights, if any, are subsequent in time and inferior in right to those of the appellant. Alaska, like other states, except possibly the original thirteen, had no indefeasible right to statehood. While holding the country as a Territory, the United States had all of the powers of a Sovereign and, if it saw fit, might even grant rights in and titles to lands which normally would go to a state on its admission. Heckman v. Sutter, 119 F. 83, 88

(9th Cir. 1902) and Shively v. Bowlby, *supra*, arrive at this result.

■ Appellees' contention that the withdrawal of the water and land for a moose range was not for a public purpose is tenuous in the extreme. The public purpose to be served by the creation of game refuges has been so widely accepted that our research reveals only one reported case in which the project was challenged on that ground. There, the Minnesota Supreme Court had no difficulty in holding that an area set aside to preserve wildlife was for a public purpose. Lyman v. Chase, 178 Minn. 244, 226 N.W. 633 (1929). The fact that the Congress under § 6(e) of the Alaska Statehood Act reserved to the United States "lands withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife," demonstrates beyond rational debate a congressional belief that such areas were set aside for public purposes. The contention is so completely without merit it deserves no additional discussion.

■ Almost as chimerical is appellees' argument that the passage of the Alaskan Game Laws, 43 Stat. 739 *et seq.*, in 1925, and subsequent enactments, 46 Stat. 1111 (1931) and 52 Stat. 1169 (1938), in some unexplained manner eroded or destroyed the power of the Executive to issue the 1941 Order. The fact that hunting may be permitted in some areas of the refuge is to us of no significance. We take notice of the fact that at times over-population develops in certain areas and that controlled hunting is part and parcel of good game management. Unless the population is controlled, the food supply may completely disappear, thus endangering the entire herd.

Other points raised by appellees are less meritorious than those just now discussed.

The judgment of the lower court is set aside. The cause is remanded to the district judge to enter a summary judgment in accordance with the prayer of appellant's complaint.