437 F.2d 1081
 1 Envtl. L. Rep. 20,093
 UNITED STATES of America, Plaintiff-Appellant,
v.
CITY OF ANCHORAGE, STATE OF ALASKA, Union Oil Company of
California, Kaiser Cement-Gypsum Corporation, and
Northern Gas Company, Inc.,
Defendants-Appellees.
FISH AND FARM PRODUCTS, INC., Cook Inlet Tug and Barge
Company, Alaska Aggregate Corporation, and
Tidewater Packing Company, Defendants-Appellants,
v.
CITY OF ANCHORAGE, STATE OF ALASKA, Union Oil Company of
California, Kaiser Cement-Gypsum Corporation, and
Northern Gas Company, Inc., Defendants-Appellees.
 Nos. 25011, 25029.
 United States Court of Appeals, Ninth Circuit.
 Jan. 26, 1971, Rehearing Denied Feb. 25, 1971.
 
 Martin Green, Atty., Dept. of Justice, Shiro Kashiwa, Asst. Atty. Gen., Washington, D.C., Douglas Baily, U.S. Atty., Anchorage, Alaska, for appellant United States.
 W. C. Arnold (argued), Anchorage, Alaska, for appellant Fish & Farm Products Inc., and others.
 Joseph D. Mullender, Jr. (argued), of Ball, Hunt, Brown & Baerwitz, Long Beach, Cal., Burr, Pease & Kurtz, Anchorage, Alaska, for appellee Union Oil Co.
 Ely, Guess, Rudd & Havelock, Anchorage, Alaska, for appellee Kaiser.
 Hughes, Thorsness, Lowe, Grantz & Clark, Anchorage, Alaska, for Northern Alaska State Atty. Gen.
 G. Kent Edwards, Atty. Gen., Robert L. Hartig, James D. Rhodes, Asst. Attys. Gen., Anchorage, Alaska, Ball, Hunt, Hart & Brown, Long Beach, Cal., for appellee.
 Before CHAMBERS, HAMLEY and KILKENNY, Circuit Judges.
 KILKENNY, Circuit Judge:
 
 
 1
 This is a consolidated appeal from summary judgments quieting title in the City of Anchorage and its lessees to certain tidelands and submerged lands within and immediately adjacent to the Alaska Railroad Terminal Reserve. Judgments were entered for appellees on the theory that title to the lands in question passed from the United States to Alaska upon the latter's admission to the Union. Alaska became a state on January 3, 1959.[1]
 
 Background
 
 2
 Anchorage is Alaska's largest city and leading seaport. It is located on the east shore of Knik Arm, a cove or bay which leads to the Pacific Ocean through Cook Inlet and the Gulf of Alaska. Ship Creek is a navigable stream which empties into Knik Arm. Appellees concede that the United States owns most, if not all, of the upland riparian property in Anchorage along the shore of Knik Arm, as well as the property along the banks of Ship Creek.
 
 
 3
 The Alaska Railroad is the only railroad in the United States which is wholly owned and operated by the Federal Government. By an Act dated March 12, 1914,[2] the Congress authorized the President of the United States to locate, construct and operate railroads in the Territory of Alaska. The legislation specifically directed him to '* * * designate and cause to be located a route or routes for a line or lines of railroad in the Territory of Alaska not to exceed in the aggregate one thousand miles, to be so located as to connect one or more of the open Pacific Ocean harbors on the southern coast of Alaska with the navigable waters in the interior of Alaska * * *.' The purpose of this railroad was to aid in the development of the natural resources of the Territory and the settlement of its public lands by providing necessary transportation from the coast to the interior.
 
 
 4
 In that connection, the statute empowered the President to 'build or otherwise acquire docks, wharves, terminal facilities, and all structures needed for the equipment and operation of such railroad or railroads * * *.' And authorized him to perform any and all acts in addition to those specifically set out in the statutory language which were necessary to accomplish the purposes and declared objects of the Act. More precisely, the President was also authorized to reserve such lands as might, in his discretion, be useful for furnishing materials for the construction of stations, terminals and docks in connection with the operation and construction of the railroad lines.
 
 
 5
 On August 31, 1915, President Wilson, under the authority of the Act, promulgated Executive Order No. 2242. This Order directed that certain lands be withdrawn from settlement, location, sale, entry or other disposition and reserved for townsite and other purposes in connection with the construction and operation of railroad lines under the Act. The Alaska Railroad Terminal Reserve,[3] a tract consisting of 551.63 acres along the ordinary high water mark on the eastern shore of Knik Arm, was among the tracts withdrawn. Included within its boundaries is the mouth of Ship Creek, a tidal body of water.
 
 
 6
 Subsequent to the establishment of the Reserve and before the date of admission of Alaska to the Union, the federal officers in charge of the Alaska Railroad filled in large areas of the tidelands and submerged lands immediately adjacent to the Reserve, constructed piers, docks and wharves on and over these lands, and dredged out other areas. Likewise, over the years substantial portions of the tidelands and submerged lands immediately adjacent to the Reserve were leased by the railroad to private companies for shipping activities and as sites for manufacturing and storage plants.
 
 
 7
 Upon its admission to the Union on January 3, 1959, Alaska claimed to own all of the tidelands and submerged lands within its boundaries. On December 22, 1961, it attempted to convey certain of these lands to the City of Anchorage, including not only the lands underlying Knik Arm adjacent to the Alaska Terminal Reserve which had been filled in, dredged out, or otherwise used by the Alaska Railroad and its lessees, but also the tidelands underlying Ship Creek within the exterior boundaries of the Reserve. Subsequently, the City of Anchorage attempted to sell and lease portions of the tidelands and submerged lands to various parties, including the other appellees.
 
 The Litigation
 
 8
 In 1965, the United States filed an action to quiet title to: (1) the tidelands and submerged lands used and occupied by the Alaska Railroad Company immediately adjacent to the Terminal Reserve and underlying Ship Creek, and (2) the lands which, although tidelands at the time of the survey of the shore of Knik Arm, had become uplands by the process of accretion and not covered by the ebb and flow of the tide. Later, the United States filed a motion for summary judgment in which it contended that it had title to the lands in question immediately adjacent to and within the Alaska Railroad Terminal Reserve by virtue of the initial reservation and also by Section 5 of the Submerged Lands Act, 43 U.S.C. 1313. After arguments and extensive pre-trial procedures, including interrogatories and cross-interrogatories, the trial court concluded that there was no substantial controversy as to the facts and entered what we shall treat as a summary judgment quieting title in favor of the appellees.
 
 Issues
 
 9
 Presented for decision are two fundamental issues: (1) whether the Alaska Railroad Act, as implemented by the Presidential Order of August 31, 1915, reserved for the use of the Alaska Railroad as a terminal, by necessary implication, the tide and submerged lands immediately adjacent to and contiguous with the ordinary highwater mark on the eastern shore of Knik Arm and also the tidelands and bed of Ship Creek within the exterior boundaries of the terminal reserve; and (2) whether title to these lands remained in the United States after the admission of Alaska into the Union on January 3, 1959.
 
 
 10
 (1) Although an unrelated statute and executive order were involved, we hold that the principles enunciated in United States v. State of Alaska, 423 F.2d 764 (9th Cir. 1970), cert. denied 400 U.S. 967, 91 S.Ct. 363, 27 L.Ed.2d 388 (Dec. 21, 1970), decided during the course of this appeal, are here controlling. Since that case analyzes and discusses most of the cases upon which the parties rely, we need not burden the legal profession, nor the judiciary, with a re-examination and discussion of the pertinent authorities. Undoubtedly, as argued by appellees, Alaska was entitled to be admitted to the Union on an equal footing with other states. This conclusion, however, does not require a conclusion that the Congress and President had no authority to grant or reserve the subject property prior to Alaska's statehood. As mentioned in United States v. State of Alaska, supra, Alaska had no indefeasible right to statehood. During the period when Alaska was a Territory, the United States had all of the powers of a sovereign and, within constitutional limits, could do as it pleased with the Alaskan lands, including lands under navigable waters.
 
 
 11
 Appellant argues that neither the Congressional Act, nor the Presidential Order, evinced an intention to reserve title in the United States to the disputed lands. We disagree. Both directly, and by necessary implication, such intention is evident. At the time of the passage of the Act and the promulgation of the Order, the interior of Alaska was, for most purposes, completely isolated from the outside world. The construction of a railroad was absolutely essential to the development of the interior. A railhead on the coastline would be useless without wharves, docks and other harbor facilities normally constructed on tide and submerged lands. At the time in question, ocean-going transportation was the only method of supply to a railhead. That the Congress recognized this obvious fact is demonstrated by the language of the Act authorizing the construction and acquisition of docks, wharves, terminal facilities and all other structures needed for the equipment and operation of the railroad and in specifically providing for the furnishing of materials for the construction of stations, terminals and docks in connection with the construction and operation of the railroad line.
 
 
 12
 Simply stated, docks, wharves and other such terminal facilities are not constructed on the uplands. Of necessity, this type of facility must be built upon tidelands or submerged lands. While it is true that neither the Act of Congress nor the Executive Order specifically reserved or granted any such lands, the language of the statute and order enabling the construction of the docks, wharves, dredging of channels and other activities compels such an interpretation. Otherwise, the enactment of the statute, the promulgation of the Executive Order, and the construction of the railroad itself could never have achieved the fundamental purpose of the Act, i.e. the free and unimpeded flow of maritime commerce from the Pacific Ocean to the railhead on the southern shore of Alaska and over the railroad for the development of the interior of the Territory.
 
 
 13
 Aside from the obvious intention of the Congress as gathered from the language of the Act, the legislative history of the enactment makes it crystal clear that Congress intended to reserve tidelands and submerged lands for stations, terminals, docks and other like purposes. This desire is seen in the speeches of Senator Jones of Washington,[4] and in the colloquy between Senators Cummins of Iowa, Smoot of Utah, Chamberlain of Oregon and Hitchcock of Nebraska during the debate in the Senate preceding the passage of the Act.[5] True, the Senators were then generally discussing a site on Resurrection Bay. However, the discussion was not limited to that particular body of water.[6]
 
 
 14
 (2) Next, appellees claim that title to the tidelands and submerged lands passed to Alaska upon its admission to the Union irrespective of the Congressional or Presidential intent at the time of providing for the establishment of the Alaska Railroad. While this issue is, of necessity, resolved against appellees in our disposition of the first point and by our decision in United States v. State of Alaska, supra, we again mention that the latter had not been decided when the district judge entered judgment against appellant. The court cited Pollard's Lessee v. Hagan, 3 How. 212, 44 U.S. 212, 11 L.Ed. 565 (1845), in support of its belief that Congress could not, as a condition of admission, reserve title to tidelands in the United States. In general, that might be a correct statement of the law as embodied in the equal footing doctrine. However, we are not here faced with an attempted reservation of tidelands in the Act admitting Alaska to the Union. Whether we consider the legislation and presidential order as a grant to the Alaska Railroad, an instrumentality of the United States, or as a reservation of title in the United States, the grant or reservation was made over a half century in advance of the admission of Alaska to the Union. This important fact distinguishes our case from Pollard's Lessee, which involved a patent issued by the United States to tidelands in Alabama subsequent to the admission of that state to the Union. Moore v. United States, 157 F.2d 760, 764 (9th Cir. 1946), cert. denied 330 U.S. 827, 67 S.Ct. 867, 91 L.Ed. 1277 (1946), draws the crucial distinction between a reservation of lands beneath navigable waters made prior to statehood and an attempted reservation of such lands made subsequent to a state's admission. Prosser v. No. Pac. R.R. Co., 152 U.S. 59, 64, 14 S.Ct. 528, 38 L.Ed. 352 (1894), recognizes the same distinction. The establishment of the Alaska Railroad was one of those 'exceptional instances' falling within the exception to the general rule stated in United States v. Holt State Bank, 270 U.S. 49, 55, 46 S.Ct. 197, 70 L.Ed. 465 (1926) and Shively v. Bowlby, 152 U.S. 1, 49-50, 14 S.Ct. 548, 38 L.Ed. 331 (1894). Beyond question, the establishment of the railroad was a 'public exigency', as that phrase was used in those cases.
 
 
 15
 In the final analysis, we are unable to differentiate between the issues here presented and those involved in United States v. State of Alaska, supra.[7] Accordingly, that portion of the summary judgment from which this appeal is prosecuted is set aside and the cause returned to the district court for judgment quieting title in the United States to the tidelands and submerged lands contiguous with and adjacent to the Alaska Railroad Terminal Reserve. Before entering such judgment, however, the court shall hold a hearing and determine the precise boundaries of the lands in question deemed reasonably necessary to effectuate the purposes expressed in the Alaska Railroad Act of March 12, 1914.
 
 
 16
 It is so ordered.
 
 
 
 [1]
 72 Stat. 339
 
 
 [2]
 38 Stat. 305
 
 
 [3]
 'Alaska Railroad Terminal Reserve
 Beginning at the corner of Sections 7, 8, 17 and 18, T. 13 N., R. 3 W., Seward Meridian, thence East 39.95 chains to the true point for the quarter section corner on the south boundary of Section 8; thence North 0 degrees 05 1/2' West 39.96 chains; thence West 99.96 chains along the quarter section line through Sections 8 and 7 to its intersection with ordinary high water mark on the east shore of Knik Arm; thence southwesterly along ordinary high water mark on the eastern shore of Knik Arm and crossing the mouth of Ship Creek to the northwest corner of Anchorage Townsite; thence East 89.06 chains; thence North 0 degrees 08' West 14.26 chains to the point of beginning, containing 551.63 acres. * * *' (Appellant's Brief, No. 25,011, page 4.)
 
 
 [4]
 51 Cong.Rec. 1908 (1914)
 
 
 [5]
 51 Cong.Rec. 1579 (1914)
 
 
 [6]
 'Mr. Smoot. I wish to say to the Senator that already there has been withdrawn by our Government a large amount of shore for the very purpose of establishing docks and wharves. * * *'
 'Mr. Cummins. Is that true of Resurrection Bay?'
 'Mr. Smoot. I think it is true as to Resurrection Bay.
 'Mr. Chamberlain. It is pretty generally true as to all of them.' 51 Cong.Rec. 1579 (1914).
 
 
 [7]
 In general support of that decision is the recent United States Supreme Court case of Choctaw Nation et al. v. Oklahoma et al., 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970), in which Justice Marshall analyzed most of the authorities cited in the briefs presently before us and arrived at the conclusion that the state of Oklahoma, upon its admission to the Union, did not receive title to the land underlying a certain segment of the navigable portion of the Arkansas River. In Choctaw, as in the instant case, there was no express reservation of the lands underlying the navigable waters, but the Court found an implicit intention to pass such lands to the Indian Nations in the treaties between the Government and the Indians made prior to Oklahoma's statehood