**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ALASKA RAILROAD CORPORATION, | No. 22-35573 |
| *Plaintiff-Appellee*, | D.C. No. 3:20-cv-00232-JMK |
| v. | |
| FLYING CROWN SUBDIVISION ADDITION NO. 1 AND ADDITION NO. 2 PROPERTY OWNERS ASSOCIATION, a non-profit, | ORDER AND OPINION |
| *Defendant-Appellant*, | |
| and | |
| MUNICIPALITY OF ANCHORAGE, DEPT OF LAW, | |
| *Intervenor-Defendant*. | |

Appeal from the United States District Court
for the District of Alaska
Joshua M. Kindred, District Judge, Presiding

Argued and Submitted August 15, 2023
Anchorage, Alaska

Filed December 29, 2023

Before:  Richard A. Paez, Jacqueline H. Nguyen, and
Bridget S. Bade, Circuit Judges.

Order;
Opinion by Judge Nguyen

---

### SUMMARY[*]

---

### Property Law

In a case in which Chief Judge Murguia is recused and Judge Bade was drawn as a replacement judge, the panel (1) withdrew the opinion filed on September 18, 2023; (2) filed a new opinion, reflecting Judge Bade's concurrence, affirming the district court's summary judgment in favor of Alaska Railroad Corp. ("ARRC") in its action seeking to quiet title in a railroad right-of-way and to clarify that ARRC's interest in the right-of-way includes an exclusive-use easement; (3) denied a petition for panel rehearing; and (4) denied a petition for rehearing en banc.

ARRC, a state-owned corporation, owns and operates Alaska's railroad system.  It possesses a right-of-way on which it operates a section of track next to an air strip owned by Flying Crown Subdivision No. 1 and Addition No. 2 Property Owners Association.  ARRC's right-of-way includes one-hundred feet on either side of the track's center

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

line, some of which directly overlaps with Flying Crown's air strip.

The panel held that the Alaska Railroad Act of 1914 authorized the creation of the Alaska Railroad, a federal railroad, and reserved railroad rights-of-way to the United States. The Alaska Railroad Transfer Act of 1982 authorized the federal government to transfer nearly all of the Alaska Railroad property rights to ARRC.

In 1950, the United States issued the "Sperstad Patent" to Flying Crown's predecessor in interest. The Alaska Railroad's track already traversed the land, and the Sperstad Patent reserved a railroad right-of-way. The panel held that the 1914 Act did not reveal the scope of the right-of-way retained by the government. Considering common law principles, the sovereign grantor canon, and the court's interpretation of the general right-of-way statute adopted by Congress in 1875, the panel concluded that, in the Sperstad Patent, the federal government intended to reserve an exclusive-use easement under the 1914 Act. The panel further held that the federal government transferred the exclusive-use easement it retained under the 1914 Act to ARRC under the Alaska Railroad Transfer Act of 1982.

## COUNSEL

Jeffrey W. McCoy (argued), Pacific Legal Foundation, Highlands Ranch, Colorado; Damien M. Schiff, Pacific Legal Foundation, Sacramento, California; Paige E. Gillard, Pacific Legal Foundation, Arlington, Virginia; Eva R. Gardner, Ashburn & Mason PC, Anchorage, Alaska;

Thomas E. Meacham, Thomas E. Meacham Attorney at Law, Anchorage, Alaska; for Defendant-Appellant.

Michael C. Geraghty (argued) and William G. Cason, Holland & Hart LLP, Anchorage, Alaska, for Plaintiff-Appellee.

Ashley C. Brown and John A. Lehman, Kemppel Huffman and Ellis PC, Anchorage, Alaska, for Amicus Curiae Matanuska Telecom Association, Inc.

## ORDER

The Honorable Chief Judge Mary Murguia is recused from this case and Judge Bade was drawn as a replacement judge pursuant to General Order 3.2h (Dkt. No. 45). The opinion filed on September 18, 2023 is hereby withdrawn. A new opinion reflecting Judge Bade's concurrence will be filed contemporaneously with this order.

The panel has voted to deny the petition for panel rehearing. Judge Nguyen and Judge Bade have voted to deny the petition for rehearing en banc, and Judge Paez has so recommended.

The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. *See* Fed. R. App. P. 35.

The petition for panel rehearing and the petition for rehearing en banc are denied. No further petitions for panel rehearing or rehearing en banc will be entertained.

# OPINION

NGUYEN, Circuit Judge:

This case concerns the property rights of two uniquely Alaskan entities.  On one side is Flying Crown Subdivision Addition No. 1 and No. 2 Property Owners Association ("Flying Crown"), a homeowners' association for the eponymous subdivision in Anchorage, Alaska.  Flying Crown is one of many subdivisions nestled in South Anchorage.  But it is not your average subdivision.  The homes in Flying Crown back up to a small air strip.  A Flying Crown homeowner can walk out her back door, hop into the plane parked in her backyard, and conveniently taxi her plane directly onto the grassy take-off and landing strip that abuts her backyard.  Some of Flying Crown's homeowners selected the subdivision for that very reason.

On the other side is the Alaska Railroad Corporation ("ARRC"), a state-owned corporation that owns and operates Alaska's railroad system.  The railroad carries millions of tons of cargo, connects rural communities to population centers in Anchorage and Fairbanks, and allows tourists to travel to remote regions off the state's road system.  ARRC also possesses a right-of-way on which it operates a section of track adjacent to Flying Crown's air strip.  Its right-of-way includes one-hundred feet on either side of the track's center line, some of which directly overlaps with Flying Crown's air strip.

For decades, Flying Crown and ARRC coexisted peacefully.  ARRC operated its railroad, and Flying Crown's homeowners took off and landed on the adjacent air strip.  Neither party was legally certain of the exact property right, but it did not seem to matter.  As far as we are aware, no

significant problems arose because both parties acted in the spirit of mutual accommodation.

In 2019, Flying Crown sent ARRC a letter demanding that ARRC relinquish any claim to exclusive use of the right-of-way. In response, ARRC filed this action seeking to quiet title in the right-of-way and to clarify that ARRC's interest in the right-of-way includes an exclusive-use easement. ARRC's claim raises challenging questions about the proper interpretation of the Alaska Railroad Act of 1914 and the Alaska Railroad Transfer Act of 1982. We will explain the legal issues in more detail below, but suffice it to say that, as a matter of safety, the railroad must possess the right to exclude anyone—including Flying Crown homeowners—from its right-of-way. Accordingly, we hold that ARRC possesses at least an exclusive-use easement in its right-of-way crossing Flying Crown's property. Because the district court properly granted summary judgment to ARRC and denied Flying Crown's cross-motion for summary judgment, we affirm.

## I.   Factual, Legal, and Procedural Background

The parties rely on railroad statutes from both the contiguous United States and Alaska. We start by reviewing the relevant history of railroad acts in the continental United States and Alaska before turning to the factual and procedural background of this litigation.

## A.   Railroads in the Continental United States

The continental United States experienced a significant boom in railroad growth in the 1800s. Between 1850 and 1871, "Congress embarked on a policy of subsidizing railroad construction by lavish grants from the public domain." *Great N. Ry. Co. v. United States*, 315 U.S. 262,

273 (1942).  Congress granted "rights of way through the public domain, accompanied by outright grants of land along those rights of way," conveyed in "checkerboard blocks." *Marvin M. Brandt Revocable Tr. v. United States*, 572 U.S. 93, 96–97 (2014).  This policy enabled railroad companies to "either develop their lots or sell them, to finance construction of rail lines and encourage the settlement of future customers."  *Id.* at 97.

The Supreme Court characterized these pre-1871 rights-of-way as "limited fee[s]."[1]  *N. Pac. Ry. Co. v. Townsend*, 190 U.S. 267, 271 (1903).  The pre-1871 rights-of-way were unquestionably exclusive.  *See New Mexico v. U.S. Tr. Co.*, 172 U.S. 171, 183 (1898) (holding that the railroad's right-of-way is "more than an ordinary easement" because it has the "attributes of the fee, perpetuity and exclusive use and possession"); *W. Union Tel. Co. v. Pa. R.R. Co.*, 195 U.S. 540, 570 (1904) ("A railroad right of way is a very substantial thing.  It is more than a mere right of passage.  It is more than an easement [and] . . . 'whatever it may be called, it is, in substance, an interest in the land, special and exclusive in its nature.'" (citation omitted)).

Congress's generous land-grant policy proved unpopular.  Western settlers complained that it discouraged settlement because railroads were slow to sell their land. *Brandt*, 572 U.S. at 97.  As a result of this and other criticisms, "[a]fter 1871 outright grants of public lands to

---

[1] The Supreme Court initially called the pre-1871 grants "absolute grant[s]," *see St. Joseph & Denver City R.R. Co. v. Baldwin*, 103 U.S. 426, 429–30 (1880), before adopting the "limited fee" designation, *see Barahona v. Union Pac. R.R. Co.*, 881 F.3d 1122, 1127 (9th Cir. 2018) ("[T]he Court apparently endorsed the conclusion that the pre-1871 grants were of a limited fee.").

private railroad companies seem to have been discontinued." *Great N.*, 315 U.S. at 274. Between 1871 and 1875, Congress passed a series of one-off acts granting individual railroads particular rights-of-way through public land in the western United States. *Id.* After several years, "[t]he burden of this special legislation moved Congress to adopt [a] general right of way statute" in 1875. *Id.* at 275.

The Supreme Court distinguished 1875 Act right-of-way grants from their pre-1871 predecessors. Unlike pre-1871 acts, the 1875 Act "grants only an easement, and not a fee." *Id.* at 271; *see also Brandt*, 572 U.S. at 104 ("[T]he [*Great Northern*] Court specifically rejected the notion that the right of way conferred even a 'limited fee.'" (citation omitted)).[2] The Supreme Court has not, however, determined whether 1875 Act rights-of-way are exclusive in nature.

## B. Railroads in Alaska

Alaska's railroad boom lagged several decades behind the contiguous United States. In the late 1800s and early 1900s, private railroads began investing in Alaska in hopes of capitalizing on the Klondike Gold Rush. But the conditions in Alaska proved challenging and, ultimately, private railroads failed. Recognizing that the developing territory needed a reliable railroad, Congress passed the

---

[2] The earliest case interpreting an 1875 Act right-of-way called the railroad's interest in its right-of-way a "limited fee." *See Rio Grande W. Ry. Co. v. Stringham*, 239 U.S. 44, 47 (1915) (stating that "[t]he right of way granted by [the 1875 Act] is neither a mere easement, nor a fee simple absolute, but a limited fee [that] carries with it the incidents and remedies usually attending the fee"). Thus, it initially seemed that the Supreme Court would treat 1875 Act easements like their pre-1871 predecessors. But the Supreme Court roundly rejected this position in *Great Northern*, 315 U.S. at 271.

Alaska Railroad Act of 1914 ("1914 Act").  *See* Act of March 12, 1914, ch. 37, 38 Stat. 305 (formerly codified at 43 U.S.C. § 975, *et seq.*). The 1914 Act authorized the president to "locate, construct and operate railroads in the Territory of Alaska."  *Id.* The Alaska Railroad was the first—and only— federally constructed and operated railroad in the United States.  *United States v. City of Anchorage*, 437 F.2d 1081, 1082 (9th Cir. 1971).

To make the railroad possible, the 1914 Act required that future land patents by the federal government in Alaska "reserve[] to the United States a right of way for the construction of railroads, telegraph and telephone lines to the extent of one hundred feet on either side of the center line of any such road."  1914 Act § 1.

In the early 1980s, the federal government decided that Alaska should take over ownership and management of the railroad.  S. Rep. No. 97-479, at 5 (1982).  Congress enacted the Alaska Railroad Transfer Act of 1982 ("ARTA"), 45 U.S.C.  §§ 1201–14,  which  authorized  the  federal government to transfer nearly all of its railroad's property rights to the state of Alaska's new state-owned Alaska Railroad Corporation.  Today, ARRC continues to own and operate Alaska's full-service freight and passenger railroad.

## C.  Litigation Background

On February 15, 1950, the United States issued federal patent No. 1128320 to Thomas Sperstad ("Sperstad Patent"), Flying Crown's predecessor in interest.  As required by the 1914 Act, the Sperstad Patent "reserved to the United States a right of way for the construction of railroads, telegraph and telephone lines in accordance with the Act of March 12, 1914."  The Alaska Railroad's track already traversed the

land when the federal government issued the Sperstad Patent.

In 1965, John Graham purchased a piece of the Sperstad Patent to develop the Flying Crown subdivision. *Oceanview Homeowners Ass'n, Inc. v. Quadrant Const. & Eng'g*, 680 P.2d 793, 795 (Alaska 1984). By 1962, an airstrip—which overlapped with the railroad's right-of-way—was built on the Sperstad land. *Id.* Many of Flying Crown's homeowners are pilots and selected the subdivision because of the airstrip.

Following ARTA's enactment in 1983, the federal government transferred the Alaska Railroad's easement over what was originally the Sperstad Patent to ARRC, first by interim conveyance and later pursuant to Patent No. 50-2006-0363. The patent purported to convey "not less than an exclusive-use easement" to ARRC.

ARRC and the Flying Crown homeowners coexisted peacefully for decades. At some point, ARRC began charging Flying Crown an annual $4,500 permitting fee to use the airstrip on the right-of-way. Flying Crown objected to the fee, but the parties seemed to have resolved the issue without litigation—ARRC terminated the fee in 2017. ARRC does not currently charge Flying Crown any permitting fees. Counsel for ARRC represented at oral argument that ARRC has no plans to reinstate the permitting fee.

Nevertheless, in 2019, Flying Crown sent ARRC a letter claiming that the ARTA transfer had "attempted to award property rights no longer owned by the federal government" and demanding that "ARRC immediately proclaim, by means of a legally recordable document, that it relinquishes any and all claim to 'exclusive use' of the right-of-way." In response, ARRC filed this action seeking to quiet title in the

right-of-way and to clarify that ARRC's interest in the right-of-way includes an exclusive-use easement.

The district court granted ARRC's motion for summary judgment and denied Flying Crown's cross motion. The court held "that ARRC possesses the interest to at least an exclusive-use easement . . . in its [right-of-way] crossing Flying Crown's property." Flying Crown appealed.

## II. Jurisdiction and Standard of Review

We have jurisdiction because this case turns on "substantial questions of federal law." *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005); *see also* 28 U.S.C. § 1331. We review de novo the district court's grant or denial of summary judgment, *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1271 (9th Cir. 2017), and we affirm.

## III. Analysis

### A. The 1914 Act

The Sperstad Patent "reserved to the United States a right of way for the construction of railroads . . . in accordance with the [Alaska Railroad Act of 1914]." Accordingly, we turn first to the scope of the interest reserved by the federal government under the 1914 Act.

The 1914 Act does not define the scope of a "right-of-way," nor does it include any textual hints as to the right-of-way's exclusivity or lack thereof. Flying Crown contends that the federal government had no exclusive easement under the 1914 Act and therefore cannot transfer such interest to the state; ARRC takes the opposite position. But neither party relies on a purely textual argument. In the absence of textual guidance, we rely on contextual indicators—

common law principles, the sovereign-grantor canon, and a contemporaneous railroad act from the contiguous United States—to determine whether the federal government intended to reserve an exclusive-use easement under the 1914 Act.  We conclude that it did.

### i.  Common Law Principles

We begin with "basic common law principles."  *Brandt*, 572 U.S. at 106; *accord id.* at 104–06.[3]  Flying Crown contends that, under common law, easements are by nature nonexclusive.  Not so.  "Easements . . . may be exclusive or nonexclusive," and "[t]he degree of exclusivity of the rights conferred by an easement . . . is highly variable."  Restatement (Third) of Property: Servitudes § 1.2 cmt. c (2000); *see also id.* § 1.2 cmt. d ("Easements and profits may authorize the exclusive use of portions of the servient estate[.]").  Exclusivity is a spectrum that ranges from "no right to exclude anyone" to "the right to exclude everyone," and nearly everything in between.  *Id.* § 1.2 cmt. c.

To determine the degree of exclusivity, "[a] servitude should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument, or the circumstances surrounding creation of the servitude, and to carry out the purpose for which it was created."  *Id.* § 4.1(1); *see also Leo Sheep Co. v. United States*, 440 U.S. 668, 682 (1979) (holding that a railroad act should "receive such a construction as will carry out the intent of Congress" which can be determined by "the condition of the country when the acts were passed, as well as to the purpose declared on their face" (citation omitted)).  Because language in the

---

[3] We draw the relevant common law principles from the Restatement (Third) of Property: Servitudes, just as the Supreme Court did in *Brandt*.

Sperstad Patent and the underlying 1914 Act provide little guidance, we look instead to the purpose and circumstances of the right-of-way reservation to determine the parties' intent.  Both weigh in favor of a finding an exclusive-use easement interest.

The express purpose of right-of-way reservations made pursuant to the 1914 Act was "for the construction of railroads."  The intent of the railroad was to

> aid in the development of the agricultural and mineral or other resources of Alaska, and the settlement of the public lands therein, and . . . to provide transportation of coal for the Army and Navy, transportation of troops, arms, munitions of war, the mails, and for other governmental and public uses, and for the transportation of passengers and property.

1914 Act § 1; *see also City of Anchorage*, 437 F.2d at 1082 ("The purpose of this railroad was to aid in the development of the natural resources of the Territory and the settlement of its public lands by providing necessary transportation from the coast to the interior.").

An exclusive-use easement best serves this purpose. Safe and efficient operation requires railroads to have the ability to exclude anyone, including the servient estate owner, at any time.  Contrary to Flying Crown's contention, an exclusive-use easement does not impair the statute's settlement purpose.  If anything, it facilitates settlement by ensuring that settlers have dependable access to transportation and goods.

Railroad rights-of-way are necessarily different than traditional easements because of the purpose of the easement.  Our circuit has recognized as much.  *See Barahona*, 881 F.3d at 1134 ("It is beyond dispute that a railroad right of way confers more than a right to simply run trains over the land.").  Logically, the scope of an easement intended to facilitate the passage of large, fast-moving machinery differs from, say, an easement to walk across a neighbor's land to access the beach.  *See, e.g.*, *New Mexico*, 172 U.S. at 181–82 ("[Right-of-way] may mean one thing in a grant to a natural person for private purposes, and another thing in a grant to a railroad for public purposes, as different as the purposes and uses and necessities, respectively, are.").  Thus, the purpose of the 1914 Act—to provide a railroad for the territory of Alaska—is best served by an exclusive-use easement.

The circumstances that led to the creation of the right-of-way also weigh in favor of finding an exclusive-use easement.  *See Leo Sheep*, 440 U.S. at 682; Restatement § 4.1(1); *see also United States v. Union Pac. R.R. Co.* ("*Union Pac. I*"), 91 U.S. 72, 79 (1875).  Flying Crown contends that the context that led to the 1914 Act is comparable to the contemporaneous 1875 Act in the contiguous United States.  But "Alaska is often the exception, not the rule." *Sturgeon v. Frost*, 139 S. Ct. 1066, 1080 (2019) (citation omitted); *Yellen v. Confederated Tribes of the Chehalis Rsrv.*, 141 S. Ct. 2434, 2438 (2021) (highlighting "the unique circumstances of Alaska").

As discussed above, the federal government supported railroads in the contiguous United States through generous land grants until public resentment developed. *Brandt*, 572 U.S. at 97.  The 1875 Act resulted from Congress's shift away from such extravagant subsidies.  Alaska was different.

Unlike the booming railroad industry in the contiguous United States, Alaskan railroad companies struggled and frequently failed. In response, the federal government introduced a radical new policy—the government itself would construct and operate the Alaska Railroad. Consequently, widespread frustration with private railroads' unmerited enrichment at the expense of the public—the very circumstance that led to the 1875 Act—never occurred in Alaska.

If anything, the circumstances that gave rise to the Alaska Railroad were more like the pre-1871, rather than the post-1875, western United States. The western United States was a vast, undeveloped land before the completion of the transcontinental railroad in 1869, *see Union Pac. I*, 91 U.S. at 80; Alaska was a similarly vast, undeveloped territory in the early 1900s, *see* H.R. Rep. No. 92, at 11 (1913). Both territories held the promise of abundant agricultural and mineral resources, as well as the potential for settlement. *See Union Pac. I*, 91 U.S. at 80; 1914 Act § 1. And just as Congress viewed the Alaska Railroad as a critical tool for the impending global unrest in 1914, *see* 51 Cong. Rec. S1896 (1914) ("[O]ne of the prime motive powers behind this bill, or one of the reasons urged for its passage, is that it is a great military necessity."), it similarly viewed a railroad as essential to Civil War-era security when it passed the pre-1871 acts, *see Brandt*, 572 U.S. at 96 ("The Civil War spurred the effort to develop a transcontinental railroad[.]").

In both contexts, serious risks led to substantial government involvement in creation of the railroad. In the pre-1871 western United States, "[t]he risks were great and the costs were staggering," and thus "[p]opular sentiment grew for the Government to play a role in supporting the massive project." *Brandt*, 572 U.S. at 96 ("[T]he Federal

Government ought to render immediate and efficient aid in its construction." (citation omitted)).      The federal government acquiesced by offering generous land grants for railroad rights-of-way.  In 1914 Alaska, where the risks were arguably greater and the costs even more staggering, the government saw the need to play a more active role in developing the railroad.  H.R. Rep. No. 92, at 12 (1913) (describing the Alaska Railroad as an "immense undertaking" in light of the "extreme cold" which requires a railroad "aided or built by [the] government[]").

These parallels make sense.  The United States acquired the western territories between 1803 and 1853.  *Brandt*, 572 U.S. at 95 (beginning with the Louisiana Purchase through the Gadsden Purchase).  The United States purchased the Alaska territory in 1867.  *Alaska v. United States*, 545 U.S. 75, 83 (2005).  Thus, development in Alaska was several decades behind the western United States.  It is unsurprising, then, that the circumstances of pre-1871 western United States—where the government granted railroad rights-of-way in exclusive-use limited fee—offer a more apt analogy to 1914 Alaska than the post-1875 western United States. Thus, the circumstances of the 1914 Act weigh in favor of finding at least an exclusive-use easement.

### ii.  Sovereign-Grantor Canon

The sovereign-grantor canon also militates in favor of exclusivity.[4]      Under the canon, "[any] doubts . . . are

---

[4] Flying Crown contends that the sovereign-grantor rule applies with less vigor to railroad acts.  We disagree.  *Leo Sheep*'s statement that "this Court long ago declined to apply [the sovereign grantor] canon in its full vigor to grants under the railroad Acts" introduces some confusion when read in isolation.  440 U.S. at 682.  But *Leo Sheep* stands for the

resolved for the Government, not against it." *United States v. Union Pac. R.R. Co.* ("*Union Pac. II*"), 353 U.S. 112, 116 (1957).   Here, the structure of the 1914 Act right-of-way— a reservation to the government instead of a grant to a private company—requires us to apply the sovereign-grantor rule to construe the right-of-way reserved to the government expansively.

Flying Crown emphasizes the Supreme Court's common articulation of the principle—"nothing passes except what is conveyed in clear language"—to argue that we should limit the government's reservation to its explicit language.   But Supreme Court cases that cite the principle arise from a governmental *grant* of a right-of-way to a private party. *See Great N.*, 315 U.S. at 272; *Union Pac. II*, 353 U.S. at 116; *Brandt*, 572 U.S. at 110 n.5.   In that context, the Court has limited the grant to its explicit terms.   But, here, the government *reserved* a right-of-way to itself.   If we were to limit the reservation to its explicit terms, we would resolve doubts against the government—not for it.   We instead follow the animating principle behind the sovereign-grantor canon, that ambiguity in land grants should be resolved in favor of the government, to interpret the reservation expansively.   Thus, the sovereign-grantor canon weighs in favor of finding at least an exclusive-use easement.

---

proposition that the sovereign-grantor rule cannot overcome the legislature's stated or implied intent—not that the sovereign-grantor rule no longer applies. *Id.* ("[P]ublic grants are construed strictly against the grantees, but they are not to be so construed as to defeat the intent of the legislature[.]" (citation omitted)).

### iii.  Contemporaneous Railroad Statute

Finally, reading the 1914 Act in concert with the 1875 Act supports exclusivity.  Flying Crown contends that the 1875 Act granted nonexclusive easements and that similar language in the 1914 Act dictates the same conclusion.  As noted above, the 1875 Act is an inapt analogy to the 1914 Act.  But even assuming the 1875 Act is pertinent, Flying Crown's argument fails because it rests on the faulty premise that the 1875 Act granted nonexclusive easements.

The Supreme Court has opined on several aspects of the interest granted by an 1875 Act right-of-way.  For instance, an 1875 Act right-of-way does not include the right to drill for and remove subsurface oil, gas, and minerals.  *Great N.*, 315 U.S. at 279.  And when the railroad abandons an 1875 Act easement, the easement extinguishes, and the interest goes to the servient landowner (not the government).  *Brandt*, 572 U.S. at 105–06.

But the Supreme Court has never addressed whether an 1875 Act easement is exclusive or nonexclusive.  *See L.K.L. Assocs., Inc. v. Union Pac. R.R. Co.*, 17 F.4th 1287, 1308 (10th Cir. 2021) (Briscoe, J., concurring in part and dissenting in part) ("What the Supreme Court did not address in *Brandt*, because it did not need to, is whether an easement granted under the 1875 Act is exclusive or non-exclusive.").  The only circuit to answer the question, the Tenth Circuit, held that "[a]n 1875 Act easement allows the grantee to exclude everyone—including the grantor and fee owner."  *Id.* at 1295.

We see no reason to depart from our sister circuit's sound reasoning.  The 1875 Act stated that a railroad could not exclude its competitors from physically narrow passages like canyons.  43 U.S.C. § 935.  The Tenth Circuit held that this

language implied that an 1875 Act easement is exclusive, subject to specific exceptions such as in narrow passages. *L.K.L.*, 17 F.4th at 1295–96. In doing so, the Tenth Circuit rejected the plaintiffs' contention that *Brandt* and *Great Northern* foreclosed exclusivity. *Id.* at 1297 (holding that *Brandt* and *Great Northern* turned on the difference between an easement and a possessory interest, which "is not relevant to whether a railroad with an 1875 Act easement has the right to exclude"). We agree. And if the 1875 Act grants exclusive-use easements, then it is only logical that the federal government reserved no less than an exclusive-use easement for itself in Alaska. Indeed, Flying Crown offers no rationale for why the federal government would reserve a *lesser* property interest for itself in the 1914 Act than it granted to private railroads in the 1875 Act.

*           *           *

In sum, the language of the 1914 Act does not reveal the scope of the right-of-way retained by the government. But common law principles, the sovereign grantor canon, and our interpretation of the 1875 Act all lead us to hold that the federal government reserved no less than an exclusive-use easement under the 1914 Act.

## B.  ARTA

We turn now to the scope of the interest transferred from the federal government to ARRC pursuant to ARTA. We hold that the federal government transferred the exclusive-use easement it retained under the 1914 Act to ARRC under ARTA.

ARTA requires the federal government to grant "not less than an exclusive-use easement" to the State under certain circumstances, all of which were met here. 45 U.S.C.

§ 1205(b)(4)(B).  Specifically, as relevant here, ARTA set out the following "procedures applicable" to lands to be transferred:

> [w]here *lands within the right-of-way*, or any interest in such lands, have been *conveyed from Federal ownership prior to January 14, 1983*, or is subject to a claim of valid existing rights by a party other than a Village Corporation, the *conveyance to the State of the Federal interest in such properties pursuant to section 1203(b)(1)(B)* or (2) of this title shall grant not less than an exclusive-use easement in such properties.

*Id.* (emphasis added).

The Sperstad Patent meets all the conditions of § 1205(b)(4)(B).  The Sperstad Patent included land within the railroad right-of-way.  The federal government granted the Sperstad Patent in 1950, meaning that the land was "conveyed from Federal ownership prior to January 14, 1983."  *Id.*  And ARTA authorized transfer of the easement across the Sperstad Patent pursuant to 45 U.S.C. § 1203(b)(1)(B).  Under the plain text of § 1205(b)(4)(B), then, "the conveyance to the State of the Federal interest" in this case "shall grant not less than an exclusive-use easement."

Citing to *Encino Motorcars, LLC v. Navarro*, Flying Crown instead contends that we should apply the distributive canon to read § 1205(b)(4)(B) as referring to property interests that have been conveyed and are subject to a claim of valid existing rights *or* property interests that have not been conveyed and are subject to a claim of valid existing

rights.  138 S. Ct. 1134, 1141–42 (2018).  But the distributive canon has no role here.  The Supreme Court held in *Encino* that "'or' is 'almost always disjunctive.'"  *Id.* at 1141 (quoting *United States v. Woods*, 571 U.S. 31, 45 (2013)).  Indeed, the Court eschewed the distributive canon in favor of the ordinary, disjunctive meaning of "or" because it was the "more natural reading." *Id.* at 1142.  Likewise, we find that the ordinary, disjunctive reading is the most natural reading of § 1205(b)(4)(B).

## IV.  Conclusion

We hold that the 1914 Act reserved an exclusive-use easement for the Alaska Railroad and that the federal government transferred that exclusive-use easement to the state under ARTA.  Accordingly, the district court properly granted ARRC's motion for summary judgment and denied Flying Crown's cross-motion for summary judgment.

**AFFIRMED.**